Filed 8/11/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>LIDIO VALDEZ MALDONADO,<br><br>   Defendant and Appellant. | B340015<br><br>Los Angeles County<br>Super. Ct. No. BA433157 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Martha Matthews and Robert Vanderet, Judges. Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Taylor Nguyen and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

_____

The jury convicted Lidio Valdez Maldonado of the continual sexual abuse of his daughter.  On appeal, Maldonado's lone claim is that he had a constitutional right to be present at a pretrial competency hearing.  We affirm.  Undesignated code citations are to the Penal Code.

## I

The government may not criminally prosecute a mentally incompetent defendant.  Federal and state law forbid it.  (*People v. Bertsch and Hronis* (2026) 19 Cal.5th 183, 226–227 (*Bertsch*).)  A defendant is mentally incompetent if, as a result of a mental health disorder, the defendant is unable either to understand the nature of the criminal proceedings or rationally to assist counsel in the conduct of a defense.  (§ 1367, subd. (a).)  Section 1368 establishes the procedure by which California state courts determine competency.

## II

We summarize the preliminary proceedings, which were extensive, and then we describe the trial.

## A

Maldonado claimed a witch named Perla made him rape his daughter.  The trial court spent some 26 months determining if Maldonado was truly psychotic.  A psychologist *chosen by Maldonado's defense attorney* ultimately opined Maldonado was malingering.  This psychologist concluded Maldonado was more comfortable in a psychiatric hospital than in prison, and that explained his witch story.  After this expert stated this opinion, the defense attorney stopped contending Maldonado might be incompetent and instead acquiesced in the expert's evaluation.  The court in turn concluded Maldonado was competent to stand

trial.  The jury convicted Maldonado, who at trial skipped his tale about Perla the witch.

That is the overview.  Now we fill in details.

Beginning in 2013, Maldonado raped his 13-year-old daughter four times a week for about a year.  Police learned of the situation in 2014 and went to Maldonado's workplace.  Maldonado fled.  It took years to catch him.

On August 9, 2021, the court called Maldonado's case for a preliminary hearing in Department 34 of the Clara Shortridge Foltz Courthouse .  Sometimes referred to simply as the Criminal Justice Center, this main courthouse is in downtown Los Angeles, about six miles from the Mental Health Court in Hollywood.  At the preliminary hearing, the defense attorney declared a doubt about Maldonado's mental competence.  Judge Aceves ordered a court-approved psychiatrist to examine Maldonado.

The court's authorization of this expert was under section 730 of the Evidence Code, which empowers courts to appoint experts who work directly for the court rather than for one side or the other.  The use of court-appointed experts is unusual in the scope of litigation generally, but within the mental health context—at least within the Los Angeles Mental Health Court—it has been routine for decades.  (Wiley, *Taming Patent:  Six Steps for Surviving Scary Patent Cases* (2003) 50 UCLA L. Rev. 1413, 1426–1427 [describing the Los Angeles Mental Health Court's use of court-appointed expert witnesses; cf. *Brown v. Los Angeles Unified School District* (2021) 60 Cal.App.5th 1092, 1113 (conc. opn. of Wiley, J.) [the option of court-appointed experts has existed in California for generations, but few judges have tried it because parties in general civil litigation usually fear it and rarely suggest it].)

Because the defense declared a doubt, Judge Aceves transferred the case to the Hollywood Mental Health Court, where in August 2021 Judge Bianco considered a report from the appointed expert, Dr. Rebecca Najera. Najera concluded Maldonado was not competent. Both sides and the court treated this report as definitive. By stipulation, then, the Mental Health Court adjourned the criminal proceedings and ordered involuntary medication for Maldonado's mental condition, as prescribed by his treating psychiatrist.

The prosecution and defense counsel attended this August 2021 hearing. Maldonado, however, was not present: his defense attorney waived his presence. At a later hearing at which Maldonado was present via video, the mental health court ordered Maldonado committed to a locked psychiatric facility for treatment. Officials transported Maldonado to Atascadero State Hospital, which is more than 200 miles from downtown Los Angeles.

More than a year later, in September 2022, the case returned to Mental Health Court. Judge Harrison presided. The Public Defender's office and the District Attorney's office both appeared. Counsel again waived Maldonado's presence. The court reviewed a report by appointed expert Dr. David Stone, who concluded Maldonado was competent to stand trial. Maldonado's lawyer did not question or object to this report, so far as the record shows. The court agreed with the expert, reinstated criminal proceedings, and ordered the case returned to the Criminal Justice Center. Again, this result effectively was a stipulation: the parties and the court agreed with the court-appointed expert.

4

On July 24, 2023, back downtown, Judge Aceves held a hearing in which the public defender again declared a doubt as to Maldonado's competence. Judge Aceves appointed a county-approved psychiatrist to examine and to report on Maldonado. The court transferred the case back to the Hollywood Mental Health Court. There, Judge Matthews presided. Maldonado's attorney waived Maldonado's appearance at this hearing.

Judge Matthews appointed Dr. Alete Arom to examine Maldonado and to report on his current mental status under section 1368, which governs the procedure for determining a defendant's mental competence to stand trial. Arom was, and is, on the Superior Court's list of approved mental health experts. (See *Panel of Psychiatrists, Psychologists, and Neuropsychologists* (updated Aug. 3, 2026) Los Angeles Superior Court <https://lascpubstorage.blob.core.windows.net/cpw/LIBOPSCriminal-3-PanelOfPsychiatristsPsychologists.pdf> [as of Aug. 7, 2026], archived at <https://perma.cc/R95D-UPX3>.

The Mental Health Court's appointment of Arom was on the motion of Maldonado's counsel.

That is, *Maldonado's defense attorney selected the mental health expert to evaluate Maldonado*. Arom was the consensus choice: the court and the prosecution agreed with Maldonado on Arom. Once again, the hearing was not adversarial.

Maldonado's attorney waived Maldonado's appearance at this hearing.

Judge Matthews set a future hearing date of September 18, 2023. With the attorneys' consent, the court continued the case to wait for Arom's report.

B

Arom wrote her report on October 15, 2023.  She concluded Maldonado was competent to stand trial.

During her video interview with Maldonado, Arom told him that her evaluation of him was not confidential.  Maldonado said he understood.

In addition to this interview, Arom also based her opinion on:

- an April 8, 2022 report by Dr. Travis McGee that concluded Maldonado was *not* competent;
- an August 30, 2022 report, also by McGee, opining Maldonado *was* competent; and
- a September 22, 2022, evaluation by Dr. David C. Stone concluding Maldonado *was* competent.

The record does not include the McGee and Stone reports.

Arom also consulted other materials, such as police reports.

Arom noted Maldonado was 53 years old.  He denied any psychiatric history, and he initially claimed he had never been psychiatrically hospitalized.

Maldonado "did not display any attention and concentration issues, and he was able to have typical back-and-forth conversation. …  He claims to hear a witch named 'Perla,' who talks to him regularly and threatens and insults him.  He believes that she has controlled his behavior, including those [acts constituting] the instant offense.  However, he did not respond to internal stimuli during the interview and did not seem at all internally preoccupied.  He was completely alert and oriented and able to focus on the conversation at hand.  Furthermore, his thought process was never tangential or

6

disorganized.  He was able to be linear even in his description of Perla the Witch."

Maldonado began smoking methamphetamine about 2010.

"[A]round 2017, while regularly abusing methamphetamine, he started to experience auditory hallucinations and paranoia.  He reported to the treatment team that he was psychiatrically hospitalized on three occasions around 2019 related to beliefs that witchcraft was being performed on him.  Each time, the police took him to the hospital while he was detoxifying from methamphetamine, including one time when he was transferred to a hospital in Modesto for 45 days.  He told the treatment team that in 2019, while he continued to use methamphetamine, he set a fire to a pile of clothing near his residence in an attempt to scare the witch away."

Arom concluded that, "[u]ltimately, I do not believe that Mr. Maldonado has a verifiable psychiatric diagnosis.  It could be that he suffered from a methamphetamine abuse disorder when he was out in the community, as apparently he used methamphetamine regularly, and it could be that at the time, it caused him some psychotic symptoms; however, at this point, there is not enough evidence to indicate that he has any type of psychotic disorder.  Given his above-mentioned long-standing history with methamphetamine, it seems likely that he does have methamphetamine use disorder.  It is possible that[, at] the time of the use, he was feeling paranoid, and that could be when his voice began, although he told me that the voice began when the witch entered his life in 2005.  Regardless, *I do not believe that the witch is an actual hallucination.*  At worst, he is feigning the entire situation to avoid punishment.  At best, he believes that

7

there is some type of witch bothering him, which helps him to explain or justify his behaviors and makes him feel less responsible or guilty without [there] being actual hallucinations or delusions. That is, the belief could be some type of theory or excuse he has made for himself in order to explain away his behaviors to himself and/others. For instance, he shared that his entire family has forgiven him because they all know that if he has done anything bad, it was because the witch made him do it and that he also forgives himself and does not feel regret or remorse because it was out of his control. Perhaps he has convinced himself of this as a way to mitigate the negative feelings or self-judgment. Even if he does have beliefs about the witch, I do not believe that they are preventing him from being able to be competent to stand trial, and I think that if he chose to, he could put them aside and work with counsel to construct his case." (Italics added.)

According to Arom, the "description of the witch throughout our interview is not consistent with a psychotic disorder. The story itself is too organized, linear, and specific and only related to his instant offense. It relates to his victim's mother, and he essentially blames the witch for forcing the mother of his children to leave him and therefore leaving him alone with his daughters. The beliefs about the witch are inconsistent with a psychotic disorder because they are not accompanied by the typical thought and behavioral disturbances of a person with his type of active set of hallucinations and delusions. For instance, he did not display any disorganized thinking or tangential or loose associations. His descriptions of the witch are perfectly linear, although obviously not logical, because having a witch speak to someone is on its face bizarre and unusual. Despite telling me

8

that he was hearing the voice during our interview, he was not internally preoccupied or distracted. Most clients with psychosis do not actively hear voices during an interview, because they are externally focused on the conversation that is occurring. If they are hearing voices during the interview, they are not able to communicate effectively at the moment that they are hallucinating, they often pause, looking distracted or mumbling under their breath. None of this happened during our interview, and he claimed to be hearing voices concurrently while we spoke, yet he was able to communicate perfectly and effectively with me. Furthermore, he did not describe any type of long-standing history of delusions except as it relates to this witch appearing [in] his life around 2005. Typically, clients with schizophrenia do not have one singular voice or singular delusion, and the subject matter is more disorganized, consisting of many voices, noises, sounds, and general disorganization. Knowing exactly who the voice is and when the voice entered the person's life and having only one voice that speaks with a purpose and a motive and sends coherent messages to a person is atypical of a client experiencing a thought disorder."

"After reviewing all of the records I was provided, I ultimately conclude that he is malingering for the purpose of secondary gain. Most clinicians who met him also found his presentation to be inconsistent with a psychotic diagnosis. Furthermore, even though he was prescribed psychotropic medication, his symptoms did not remit in any way, which is also atypical of someone with schizophrenia. Although many clients have refractory schizophrenia and sometimes symptoms persist, to remain [at] exactly the same level of symptomology even on psychotropic medications is unusual. Although it does occur, in

9

those cases the clients are typically so severe that they present as overall disorganized, bizarre, and almost incoherent.  Also, hallucinations are typically the first symptom to dissipate once antipsychotics are begun even if delusions remain.  The fact that this is not the case with Mr. Maldonado calls into question whether or not he actually had a mental illness that needs to be treated.  Ultimately, when he was found competent to stand trial, he was not actually on any medication, because the hospital felt that there was no particular diagnosis or symptoms to treat.  [¶] Throughout the chart, there are specific references to his malingering, and I believe that all of their conclusions are accurate."

Arom supported her conclusion that Maldonado was malingering with other evidence from his records.  For instance, Maldonado said that, if his sentence is life in prison, he will be "killed in prison, because they don't like sex offenders."

"In a nonchalant attitude," Maldonado consistently stated he had "no motivation to leave the hospital."  Maldonado acknowledged he was more comfortable in the state hospital than he had been in jail, and that he would prefer to stay at the hospital for the rest of his life.  "At that point, the staff began to suspect that he was feigning his impairments to avoid being returned back to court."

Arom said Maldonado could understand the nature of the criminal proceedings.  He knew the charges against him.  He understood the different kinds of pleas and the roles of the courtroom actors.

Maldonado also could assist in the conduct of his defense.  "If he so chooses, he can cooperate with counsel in constructing his defense.  Any lack of cooperation or indication that he is

10

unable to cooperate is, in my opinion, volitional.  I considered the idea of the symptoms involving the witch very carefully.  Although there is no way to be entirely certain that he is malingering, many other clinicians opine that he is, and so do I.  [¶]  However, even if we presume that he does believe that the witch is real, or even if he is having hallucinations about the witch, whether it is due to psychosis or methamphetamine induced psychosis, it does not interfere with his ability to rationally assist counsel constructing his defense. …  He also understands that there is DNA evidence against him, and the DNA evidence is quite convincing.  He said that he would not take his case to trial because 'they are going to believe the DNA over the witch no matter what happens.' "

Arom commented that "Mr. Maldonado is likely to be difficult to work with because of his fear of facing his charges and unwillingness or difficulty accepting the potential outcome of his case.  Furthermore, it seems likely that somewhere along the line, a doubt could be declared again about the witch, because he does sound psychotic.  However, it seems well established that his symptoms are not attributable to a psychotic disorder or any other type of [Diagnostic and Statistical Manual] diagnosis and therefore should be considered to be feigned.  He will be especially difficult to work with if he is not provided with an offer that he feels is fair; however, this would once again be due to his personality traits rather than to any type of underlying psychiatric disorder.  Any lack of cooperation would be of his own choosing."

Arom's final conclusion was that Maldonado was competent and he needed no mental health services.  "He was in the state hospital for many months where many different clinicians had

the chance to observe him, assess him, and treat him. Ultimately, they tapered him off of medication, not believing that it was helping him because of the lack of an underlying diagnosis. By the end of his stay, he was not prescribed any medication. … [H]e is not amenable to treatment, and treatment does not seem like it would be effective. It does seem that perhaps Mr. Maldonado has some anxiety about the potential outcome of his case, especially as he contemplates whether he will spend a lifetime in prison marked as a sex offender."

C

On October 16, 2023, Judge Matthews of the Mental Health Court held a hearing to review Arom's report. The hearing was brief. The court called the matter and asked for appearances. The deputy public defender and the deputy district attorney stated their names and job titles. The prosecutor immediately said, "The People submit on Dr. Alete Arom's report opining that Mr. Maldonado is competent to stand trial." Defense counsel agreed: "Yes. [W]e're submitting on the report."

We emphasize words in Judge Matthews's response: "Okay. *Mr. Maldonado's appearance is waived due to the unavailability of video*, and both parties submit on Dr. Arom's report. The court receives that report into evidence, and on the basis of that evidence finds that Mr. Maldonado is competent to stand trial. Criminal proceedings are reinstated. We are at day 0 of 10 for a preliminary hearing. Mr. Maldonado is ordered to the Foltz Courthouse downtown, Department 34, tomorrow, October 17. L.A. Sheriff's Department to transport him." (Italics added.)

This was another instance of consensus decisionmaking in the Hollywood Mental Health Court.

It was Maldonado's absence from this competency hearing that gave rise to the issue in this appeal.

### D

On October 17, 2023, the case returned downtown, where the court held a preliminary hearing and set the matter for trial. The defense did not declare a doubt as to Maldonado's competence. Judge Vanderet presided over the jury trial in late July 2024.

At trial, the evidence was that, for about a year, Maldonado raped his 13-year-old daughter four times a week. She told no one: "I was just scared. I didn't want to tell anybody." In 2014, the daughter became pregnant and gave birth in a bathroom. "The baby fell in the toilet." The infant was stillborn with deformities characteristic of incest. DNA testing confirmed Maldonado was the father. Maldonado fled and remained at large for years.

The jury deliberated for 43 minutes before returning a verdict of guilty. The sentence was 25 years to life.

### III

The Sixth Amendment gives defendants in criminal prosecutions the right to be personally present at any proceeding in which their appearance is necessary to prevent interference with opportunity for effective cross-examination. (*People v. Alvarez* (2025) 18 Cal.5th 387, 450.) Due process similarly guarantees the right to be present at any stage that is critical to the outcome and where the defendant's presence would contribute to the fairness of the procedure. (*Ibid.*) Due process, however, does not require defendants' presence at hearings without a jury on matters where the defendants' presence bears

13

no reasonable and substantial relation to their opportunity to defend the charges against them.  (*Id.* at pp. 450–451.) Maldonado's absence from the October 16, 2023, competency hearing did not interfere with either an opportunity for effective cross examination or the hearing's fairness.  Moreover, assuming there was interference, it was harmless beyond a reasonable doubt.

Neither the defense nor the prosecution presented live testimony at the competency hearing.  Both counsel chose to submit the matter of competency entirely on the expert report of Dr. Alete Arom.

Given the nature of competency proceedings, defense counsel have the right to waive a live hearing and to submit on psychiatric reports without violating defendant's due process rights, even over a client's objection.  (*Bertsch, supra*, 19 Cal.5th at pp. 229–230;

; *People v. Weaver* (2001) 26 Cal.4th 876, 903–904 [nothing "precludes a defense attorney from waiving a jury, forgoing the right to present live witnesses, and submitting the competency determination on the psychiatric reports filed with the court"]; *People v. Masterson* (1994) 8 Cal.4th 965, 972–973 ["[C]onsiderations that cause us to conclude that counsel need not entrust key decisions to the client also compel the conclusion that the client may not veto those same decisions.  Whether or not the client objects, counsel must be allowed to do what counsel believes is best in determining the client's competence"]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1168–1169 [rejecting the argument that submission on reports was unconstitutional, noting defense counsel could waive "available incidents of the hearing procedure, i.e., the right to jury trial and the rights to

14

present oral testimony and to confront and cross-examine witnesses"]; see generally *People v. Lawley* (2002) 27 Cal.4th 102, 131 ["Although it arises in the context of a criminal trial, a competency hearing is a special proceeding, governed generally by the rules applicable to civil proceedings"].)

Maldonado does not argue *cross-examination of Arom* would have been effective or would have increased the hearing's fairness.

Maldonado maintains he could have convinced his counsel to *call him as a witness* and thereby could have contributed to the hearing's fairness, but that argument is incorrect here.

First, Maldonado does not suggest what testimony he would have proffered in response to Arom's detailed report such that his counsel might have altered his thoughtfully charted course and been persuaded to let him testify. (See *People v. Davis* (2005) 36 Cal.4th 510, 533 [finding defendant's absence from a hearing harmless beyond a reasonable doubt in part because defendant remained silent about what he would have said or conveyed, and also because it appeared defendant and counsel had the opportunity to review in advance the written submissions pertinent to the hearing].)

Moreover, Maldonado could have intelligently aided his counsel's decision to withhold or to offer Maldonado's testimony only if Maldonado had been competent. A finding of competence was the actual and all-but-ordained result of the uncontested hearing. (See § 1369, subd. (c)(1) ["If neither party objects to any competency report submitted pursuant to subdivision (b), the court may determine the competency of the defendant based on any such competency report"].) Yet Maldonado's argument is premised on him being allowed to testify to his *incompetence*. "If

15

a defendant were to assert that he or she was incompetent, allowing such a defendant to attempt to prove his or her own incompetence would be nonsensical." (*People v. Lightsey* (2012) 54 Cal.4th 668, 697; but see *People v. Harris* (1993) 14 Cal.App.4th 984, 993–994 ["[W]hen defense counsel seeks to prove defendant's incompetence over his or her objection, and the defendant expresses the desire to testify that he or she is competent, counsel should permit defendant to so testify, unless the court separately determines that the defendant is incompetent to do so"].)

To the extent Maldonado may be suggesting it was necessary for the court to witness his demeanor, that argument, too, is not persuasive here. This non-jury competency hearing occupies less than one page of a reporter's transcript and could not have lasted more than a few minutes. What demeanor Maldonado might have displayed in that time is speculative. And the point of declaring doubt and soliciting the expert report was to obtain expert explanations for his conduct. (See *People v. Hovey* (1988) 44 Cal.3d 543, 585 [defendant's suggestion that jurors should have had the opportunity to watch him react to re-read testimony rested entirely on speculation and did not overcome a finding of harmlessness beyond a reasonable doubt]; *Sturgis v. Goldsmith* (9th Cir. 1986) 796 F.2d 1103, 1112 (*Sturgis*) (dis. opn. of Wallace, J.) ["[A] defendant's demeanor and behavior 'could be so easily contrived as to be of little persuasiveness in the light of all other evidence' "].)

In addition to all this, the trial court later had an opportunity to assess Maldonado when he requested a hearing under *People v. Marsden* (1970) 2 Cal.3d 118. After hearing from Maldonado personally, defense counsel reminded the court of the

16

competency proceedings and that conclusion was that Maldonado was not suffering from "a [delusional] process or mental health condition at all." The trial court responded "based on his conversation with the court, I sort of agree. … I cannot find that he is not able to assist you." The defense attorney again did not declare a doubt as to Maldonado's competence. The trial concluded.

Maldonado's presence would not have increased the fairness of his hearing.

## DISPOSITION

The judgment is affirmed.

WILEY, Acting P.J.

We concur:

VIRAMONTES, J.

SCHERB, J.

17

**Wiley, J., concurring.**

I wrote for the panel, which unanimously agrees there was no *harmful* error in this case.  I write separately, and more broadly, to explain my further view there was no error at all.

I

The first step is to describe the Los Angeles Superior Court's specialized system for handling competency questions in criminal cases.  This large superior court has a longstanding, substantial, and specialized Mental Health Division.  (*Mental Health Courts*, Judicial Branch of California <https://courts.ca.gov/programs-initiatives/collaborative-justice-courts/adult-courts/mental-health-courts> [as of Aug. 7, 2026], archived at <https://perma.cc/3NNU-ZQWJ>.)  Los Angeles trial court judges of experience appreciate the important role this specialized system plays in the administration of justice.

A courthouse exclusively devoted to mental health issues is now located on Hollywood Boulevard in the Hollywood area of Los Angeles.  (*Hollywood Courthouse*, Los Angeles Superior Court <https://www.lacourt.ca.gov/apps/courthouse/HC/detail> [as of Aug. 7, 2026], archived at <https://perma.cc/7XUR-AZHH>.)  This is the Hollywood Mental Health Court.  (*Los Angeles County, New Hollywood Courthouse*, Judicial Branch of California <https://courts.ca.gov/los-angeles-county-new-hollywood-courthouse> [as of Aug. 7, 2026], archived at <https://perma.cc/9K4R-SZH8>.

When an issue of trial competency arises in the course of a criminal prosecution, the Los Angeles Superior Court has procedures about when the judge in that other courthouse transfers the matter to the Hollywood Mental Health Court,

which specializes in evaluating mental health issues. When there is a transfer, the prosecutors and public defenders in the non-specialized criminal court typically hand off the case to their colleagues assigned full-time to the mental health court. If the case returns to the non-specialized courthouse, the original attorneys on both sides resume their duties.

Many people do not know much about the realities of mental illness. Judges, prosecution and defense attorneys, and staff assigned to Hollywood Mental Health courthouse, however, gain long-term familiarity with this world. (Cf. Garcia, *Inside LA's mental health court: Meth, homelessness and the judge who wants to help* (Apr. 23, 2025) CalMatters <https://calmatters.org/health/mental-health/2025/04/los-angeles-mental-health-court/> [as of Aug. 7, 2026], archived at <https://perma.cc/WL6A-9H79> [when criminal defendants' mental competency to stand trial is at issue, their cases are redirected to the specialized Mental Health Court].)

For those unfamiliar with the arcane world of mental illness, entering this world is a learning experience. A typical first reaction is dismay at seeing how profoundly an incurable disease like schizophrenia can impair a life and burden a family. Common symptoms include delusions: false, fixed beliefs the defendant genuinely and deeply holds to be true. Another reaction is deepened respect for those in the system—including defense attorneys—who have devoted careers to serving this population.

Newly-assigned bench officers at this courthouse typically, and quickly, stop using words like "crazy" and "nuts."

These repeat players at the Hollywood Mental Health Court learn the ins and outs of the Diagnostic and Statistical

2

Manual.  (*Diagnostic and Statistical Manual of Mental Disorders* (Aug. 6, 2026) Wikipedia <https://en.wikipedia.org/wiki/Diagnostic_and_Statistical_Manual_of_Mental_Disorders> [as of Aug. 7, 2026], archived at <https://perma.cc/QHS9-MSN4>.) They gain some familiarity with the evolving array of psychiatric medications.  (*Psychiatric medication* (Jul. 18, 2026) Wikipedia <https://en.wikipedia.org/wiki/Psychiatric_medication> [as of Aug. 7, 2026], archived at <https://perma.cc/K5P9-6TWA>.)  They acquire experience with decoding mental health jargon like "internal stimuli," "hearing an unseen person," and "emotionally labile."  They learn auditory hallucinations are common and visual hallucinations are not.  And so forth.

These veterans also become familiar with the mental health experts on the court's approved list of such experts.  (See (See *Panel of Psychiatrists, Psychologists, and Neuropsychologists* (updated Aug. 3, 2026) Los Angeles Superior Court <https://lascpubstorage.blob.core.windows.net/cpw/LIBOPSCriminal-3-PanelOfPsychiatristsPsychologists.pdf> [as of Aug. 7, 2026], archived at <https://perma.cc/R95D-UPX3>; Wiley (2003) *Taming Patent:  Six Steps for Surviving Scary Patent Cases* (2003) 50 UCLA L. Rev. 1413, 1426–1427 [describing the Mental Health Court's use of court-appointed expert witnesses].)  The lawyers on both sides can come to share respect for selected experts who have proven themselves reliably impartial and trustworthy.  The lawyers can be confident the judge will share their trust.

Karl Fenske was the public defender who represented Maldonado at trial.  The summer the defense was declaring a doubt about Maldonado's competence, Fenske published an article about the Los Angeles Mental Health Court.  Fenske wrote that, "[a]lthough imperfect, the [Hollywood] Mental Health

3

Court has a range of effective options which simply aren't available within the criminal courts." (Fenske, *Los Angeles can't allow mental health court to fail* (Aug. 2, 2023) Daily Journal <https://dailyjournal.com/articles/374142-los-angeles-can-t-allow-mental-health-court-to-fail> [as of Aug. 7, 2026], archived at <https://perma.cc/WW4X-LFPL>.)

The context for this case is familiar to the trial lawyers and judges who make the system run. Those lacking this hands-on experience may wonder why a case can bounce back and forth between a criminal court and a mental health court for years. One reason is that medication can enormously help a psychotic defendant by combatting delusions, but that the benefit recedes if the defendant stops the medication and loses competency—again. Another reason is that fully competent defendants can feign mental illness. Some malingering is transparent, but a proficient fraud or a cultivated fantasy can take years for professionals to discern. That happened here.

## II

Maldonado claims his constitutional rights were violated when his lawyer waived his appearance and the October 16, 2023 competency hearing proceeded without him.

To summarize, Maldonado's absence violated neither his right to confront witnesses nor his right to due process. His lawyer had decided cross-examining the sole witness—the court-appointed expert psychologist *his lawyer had selected*—could not further Maldonado's cause. Maldonado's presence could not have affected this decision. Nor would it have aided the search for truth, which is the goal of cross-examination. Maldonado's presence would not have added to the fairness of the hearing. The hearing was perfectly fair. Both sides had notice and an

4

opportunity to be heard.  Both sides were represented by counsel. The proceedings were professional and courteous.  The consensus decisionmaking was by informed and reasonable stipulation. Maldonado's absence detracted from neither the reality nor the appearance of fairness.

I now explain the basis for this summary.

Two constitutional rights are germane.

First, the confrontation clause of the Sixth Amendment gives defendants the right to be personally present at any proceeding in which their appearance is necessary to prevent interference with their opportunity for effective cross-examination.  (*People v. Alvarez* (2025) 18 Cal.5th 387, 450–451 (*Alvarez*).)

Second, the Fourteenth Amendment's due process clause guarantees defendants a right to be present at any stage critical to the outcome where their presence would contribute to the fairness of the procedure.  California's state constitution also gives the right to be personally present at critical proceedings. (*Alvarez, supra*, 18 Cal.5th at pp. 450–451.)

These provisions do not, however, mean defendants have a right to be present when the court hears or discusses questions of law or other matters as to which their presence bears no reasonable and substantial relation to their opportunity to defend against the charges they face. (*Alvarez, supra*, 18 Cal.5th at pp. 450–451.)

A

Maldonado suffered no *confrontation clause* insult.  His lawyer chose to submit on the Arom report.  Maldonado does not attempt to impeach this lawyer's professional decision to refrain from calling and questioning Arom.  The attorney evidently

5

believed Arom's report was right, or that she could not advance Maldonado's interests by questioning Arom in person. Maldonado fails to identify some stone left unturned in Arom's report. Nor does he suggest any way in which examining Arom would have profited him.

Cross-examining Arom at this competence hearing would have made no sense. Maldonado's own attorney had selected Arom from the court's familiar panel of experts. We can presume this was a well-informed decision by an attorney who worked daily in the Hollywood Mental Health Court and who knew the lay of the land. On its face, the Arom report was professional and of high quality: as we have seen, it was lengthy, careful, detailed, and nuanced. There was no obvious weakness, no gap in logic. For the lawyer looking for impeachment material, this tree offered no fruit.

Maldonado's confrontation clause argument fails.

B

Neither did Maldonado's absence infringe his right to *due process*. The central concern of due process is fundamental fairness. (*Salas v. Cortez* (1979) 24 Cal.3d 22, 27.) This competency hearing was fundamentally fair: lawyers all around; notice and a full opportunity to be heard; and informed and collegial decisionmaking on the merits.

This hearing thus was *extremely* fair.

Maldonado's presence could not have added fairness. Maldonado's only concrete suggestion is in his reply brief, where he mentions his "right to testify."

Maldonado's exercise of a supposed right to testify could not have contributed fairness to the competency hearing. A moment's reflection proves it.

6

Begin by presuming Maldonado *was* competent.  If so, he cannot fault the hearing's fairness.  The court *did* find him competent:  the hearing produced the substantively correct result, in an open, orderly, courteous, and procedurally fair setting where his attorney had the unrestricted opportunity to present everything to Maldonado's best advantage.

Now presume Maldonado was *in*competent.  By definition, then he then would have been unable to make a rational decision about whether to testify.  An attorney with Maldonado's best interests at heart represented him.  That attorney decided calling Maldonado as a witness would be unhelpful.  It would not increase the fairness of a competency hearing to have an incompetent client attempting to testify over the professional advice of counsel, thereby exposing the client to the prosecution's cross.  As one seasoned criminal defense attorney reputedly said, "Watching your client endure cross-examination is like watching a baby crawl across the freeway."  The more incompetent the client, the more agonizing the prospect.

"How can a person whose competence is in doubt make basic decisions regarding the conduct of a proceeding to determine that very question?  …  Whether or not the client objects, counsel must be allowed to do what counsel believes is best in determining the client's competence." (*People v. Masterson* (1994) 8 Cal.4th 965, 972–973 (*Masterson*).)

Maldonado's due process challenge fails.

### C

Maldonado cites seven cases.

### 1

Maldonado's most substantial citation is to the split decision in *Sturgis v. Goldsmith* (9th Cir. 1986) 796 F.2d 1103

7

(*Sturgis*).)  The *dissent* in that opinion, however, had the better argument.  I respectfully reject the *Sturgis* majority's analysis.

The *Sturgis* case began when Bill Sturgis killed a woman. Arizona state prosecutors charged Sturgis with murder, and his lawyer declared a doubt.  This led to five competency hearings over about four years.  Some hearings were contested:  at least eight mental health professionals, including seven psychiatrists, reported or testified about Sturgis.  Some professionals suggested he was feigning mental illness.  Sturgis himself testified at one hearing.  At that same hearing, his attorney also cross-examined several psychiatrists.  (*Sturgis, supra*, 796 F.2d at p. 1105.)

At the fifth hearing, Sturgis was not present.  His attorney submitted on the reports of doctors Wellish and Tuchler, who both wrote Sturgis *could* assist in his defense and *could* understand the proceedings.  The court ruled Sturgis was competent.  (*Sturgis, supra*, 796 F.2d at p. 1105.)

At trial, Sturgis conceded he was the killer.  His defense was insanity.  The jury convicted Sturgis, and the Arizona Supreme Court affirmed.  (*State v. Sturgis* (1976) 113 Ariz. 311, 312.)

Sturgis unsuccessfully petitioned the federal district court for habeas relief.

By a two-to-one vote, a Ninth Circuit panel reversed.

The majority reasoned the state trial court violated Sturgis's constitutional rights by finding him competent at a hearing at which Sturgis was not present.  "A competency hearing is intricately linked to the fullness of a defendant's ability to defend against the charge."  (*Sturgis, supra*, 796 F.2d at p. 1108.)  The logic requiring a defendant's presence at trial also applied to the pretrial competency hearing.  (*Ibid.*)  "The

8

defendant's demeanor and behavior in the courtroom can often be as probative on the issue of his competence as the testimony of expert witnesses." (*Id.* at p. 1109.) The majority concluded Sturgis had been deprived of a constitutional right.

The *Sturgis* dissent wrote the majority opinion was "fundamentally flawed." (*Sturgis, supra*, 796 F.2d at p. 1111 (dis. opn. of Wallace, J.).) That majority opinion was the first to hold "that a defendant's presence at a competency hearing is constitutionally mandatory." (*Ibid.*)

The dissent made four criticisms I endorse.

First, the majority wrongly equated a competency hearing with trial. A trial is an adversarial adjudication of guilt designed to be final, but a competency hearing is unconcerned with guilt.

Neither is a competency hearing final. Rather, the focus is whether a defendant—at that moment—could understand and participate in the trial. (*Sturgis, supra*, 796 F.2d at p. 1111 (dis. opn. of Wallace, J.); see *People v. Samuels* (1981) 29 Cal.3d 489, 496 ["the sole purpose of the section 1368 hearing is to determine defendant's competence, not his guilt"]; cf. *People v. Bertsch and Hronis* (2026) 19 Cal.5th 183, 267–268 [the right to confrontation is a trial right that does not apply with full force at a preliminary hearing].)

There is no necessary finality because the competency issue can resurface, as it did for both Sturgis and Maldonado— repeatedly.

Second, defendants' presence may at times be detrimental to their interests because they may "be affected adversely by hearing testimony" about their mental condition. (*Sturgis, supra*, 796 F.2d at p. 1112 (dis. opn. of Wallace, J.).) It can take considerable self-control to listen to people saying "you are

9

insane." Some clients lack impulse control, and their conduct will be on the record and visible to the judge. They inadvertently can create a record detrimental to self-interests: a record that may be fully available to future prosecutors.

Third, "[t]he majority declares that a "defendant's demeanor and behavior in the courtroom can often be as probative on the issue of his competence as the testimony of expert witnesses." … While this may be true in regard to proceedings in front of a jury deciding his guilt or innocence, a competency hearing entails different considerations because a defendant's demeanor and behavior 'could be so easily contrived as to be of little persuasiveness in the light of all other evidence.' " (*Sturgis, supra*, 796 F.2d at p. 1112 (dis. opn. of Wallace, J.) quoting *United States v. Makris* (S.D.Tex. 1975) 398 F.Supp. 507, 511.)

This point is forceful in this case, where the stipulated expert concluded Maldonado had been presenting an inauthentic self for years.

Fourth, the majority "vacillat[ed] between the right to presence and due process [and] can only be read as resting on some due process ground that Sturgis's absence gave the proceeding an 'appearance of impropriety.' " (*Sturgis, supra*, 796 F.2d at p. 1112 (dis. opn. of Wallace, J.).)

That also is my reading of the majority opinion in *Sturgis*, which never explained to *whom* Sturgis's hearing appeared to be unfair, and *why*.

The dissent concluded the majority opinion had stretched its concept of fairness beyond reasonable limits. (*Sturgis, supra*, 796 F.2d at p. 1112 (dis. opn. of Wallace, J.).)

10

The majority offered no effective response to the dissent's points. Nor did the majority ascribe significance to the participation of Sturgis's own lawyer in the process. That lawyer knew Sturgis and knew the doctors who evaluated Sturgis. Yet, for the *Sturgis* majority, that attorney's professional judgment did not rate a mention, let alone deference. The *Sturgis* majority presumed it knew better what was good for Sturgis than did the lawyer who actually knew Sturgis's mind.

It would be possible to distinguish *Sturgis*. The state court setup in Arizona may not have had a mental health court that operated as effectively and collegially as does the one in the Los Angeles Superior Court. The *Sturgis* majority offered little information about how that Arizona state process worked. Was there any specialized mental health court? Did specialized lawyers and judges staff that court, if it existed? Did the state system have a tradition of informed and collegial decisionmaking on competency issues? Were defense attorneys typically knowledgeable and opinionated about which court-approved mental health expert the court would appoint to evaluate the client about whom the lawyer had declared a doubt? The *Sturgis* majority did not say. Our case differs, because the Los Angeles Mental Health Court has these features.

My disagreement with the *Sturgis* majority, however, is fundamental. I reject the *Sturgis* majority opinion, root and branch.

My dear colleagues, whom I respect and cherish, opt to decide this case on narrower grounds. I respect their judgment and admire their wisdom. Deciding narrowly generally minimizes the chance of present error.

11

In this case, however, there are costs as well as benefits to a narrow decision. A narrow decision today casts uncertainty on the practice at issue in future cases. Sensible prosecutors will, in light of this uncertainty, steer clear of it. They will insist defendants appear at all competency hearings, and sensible trial judges will back them up. Imagine the torment of bringing back a victim, like the one in this case, to relive her childhood horrors in a second trial necessary only because the first trial was tainted by a pretrial hearing like the one at issue today. No feeling prosecutor or trial judge would risk that.

What then will be lost? If video appearances suffice, perhaps very little. But video appearances are imperfect substitutes for in-person hearings. Experienced judges know, for instance, people can stand behind the camera and signal answers to the witness. If a video appearance is undesirable or infeasible, then patients will have to take buses to court, perhaps from 200 miles away. The multi-day stay in Los Angeles can disrupt a patient's medication routine and health regimen. If harm to future patients is the long-run result of Maldonado's appeal, we gain further proof of the law of unintended consequences.

2

Maldonado also cites *United States v. Gillenwater* (9th Cir. 2013) 717 F.3d 1070, 1073 (*Gillenwater*). This case held a defendant has a constitutional and federal statutory right to testify at a federal pretrial competency hearing and only the defendant, not counsel, can waive the constitutional right to testify.

*Gillenwater*'s holding may diverge from California state law. (See *Masterson, supra,* 8 Cal.4th at pp. 966–967, 972–973 [in competency proceeding, counsel may waive jury trial and

12

make other decisions regarding jury trial, even over defendant's objection]; cf. *People v. Blackburn* (2015) 61 Cal.4th 1113, 1116 ["the trial court must advise the [mentally disordered offender] defendant personally of his or her right to a jury trial and, before holding a bench trial, must obtain a personal waiver of that right from the defendant unless the court finds substantial evidence— that is, evidence sufficient to raise a reasonable doubt—that the defendant lacks the capacity to make a knowing and voluntary waiver, in which case defense counsel controls the waiver decision"].)

We do not confront the *Gillenwater* issues in this case. For our purposes, the significance of *Gillenwater* is its approving citations of *Sturgis*. (See *Gillenwater*, *supra*, 717 F.3d at pp. 1077–1085 & fn. 5.) These citations ignore the *Sturgis* dissent and repeat, but do not fortify, the logic of the *Sturgis* majority. *Gillenwater* therefore contributes no independent force to Maldonado's argument.

3

*People v. Ford* (2020) 56 Cal.App.5th 385, 392 is inapposite because, in that case, the "Attorney General does not dispute that appellant was denied his constitutional right to be present" at a hearing to determine competence. A different Attorney General has decided, wisely, to withhold a similar concession in Maldonado's case. A precedent based on a faulty concession is not authority for a dispute lacking that vital concession.

4

*People v. Jernigan* (2003) 110 Cal.App.4th 131, 137 (*Jernigan*) "reject[ed] defendant's contention that the trial court's failure to obtain his personal waiver of the right to be present at the hearing violated his right to due process." I agree with this

13

holding, which is contrary to Maldonado's argument. The *Jernigan* opinion also held the defendant there had waived any right to appear at the hearing. (*Ibid.*) That holding is not relevant to this case.

5

*People v. Harris* (1993) 14 Cal.App.4th 984, 993 *assumed* the defendant had a right to be present at a competency hearing and then ruled no prejudice flowed from transgressing this assumed right. I would *hold* there is no such constitutional right under the circumstances of this case. A contrary assumption in an earlier decision presents no conflict with my analysis.

6

Maldonado cites *In re Waite's Guardianship* (1939) 14 Cal.2d 727, 729. This venerable decision reviewed a bizarre ruling by a trial court in a guardianship action. The trial court strangely refused to allow the defense attorney to put his client on the stand. The trial court said "I don't want to hear from her. … If you have any medical testimony I will be glad to hear it, but I don't want to hear from the lady. I don't know anything personally about her mental condition." The Supreme Court rightly slapped down this outrageous trial court ruling. (*Id.* at p. 730.)

Maldonado's case is unlike the *Waite* situation, where defense counsel and client together tried to get the client's side of the story into the record, but the trial judge peremptorily and unjustifiably blocked them. This citation is inapposite.

7

Maldonado cites *Cramer v. Tyars* (1979) 23 Cal.3d 131, 134, 138. *Cramer v. Tyars* concerned the constitutional right against self-incrimination. In this case, our high court held

14

developmentally disabled people may not invoke this Fifth Amendment right when subject to a petition for civil commitment to the state Department of Health.  Therefore the government can call them as witnesses at their commitment hearings.  (*Id.* at p. 137.)  "[N]o witness has a privilege to refuse to reveal to the trier of fact his physical or mental characteristics where they are relevant to the issues under consideration."  (*Ibid.*)  This holding is irrelevant.

* * * * * * *

As a matter of professional judgment and practice, criminal defense counsel may prefer to have their clients attend most or all competency hearings in the Los Angeles Superior Court.  The defense attorney, however, may decide to proceed without the client for many valid reasons, including a reluctance to disturb the client's medication regimen at the distant hospital placement.  The client has no constitutional right to upset the results of that competency hearing on account of being excluded from it.  I would affirm without qualification.


WILEY, Acting P.J.

15